## NEW YORK OYER AND TERMINER.

### August 8, 1851.

Before Edmonds, Justice, and two aldermen..

### The People v. Otto Grunzig

Dying declarations may be given in evidence, when the deceased has no hope of a recovery.

It is a matter of discretion with the judge, to permit the summing up to be interrupted, for the purpose of enabling the prosecution to put in evidence, which had been inadvertently omitted.

In looking for motive, in order to ascertain if there was an intent to kill, the birth-place, education, and manners, and customs of the country of which the prisoner was a native, and in which he had been brought up, may be inquired into.

The prisoner was indicted for murder, in poisoning his wife.

They were natives of France, and were married there. He left her there, and came to America. After a while, she followed him, and on her arrival, she found him living with another woman, by whom he had a child, but to whom he was not married. This other female, Margaritta Lorenz, did not know that he was married, but urged him to marry her, which he promised to do when their child became old enough to be christened. In the meantime, the wife arrived, and as Margaritta testified, "she scolded at first, but in half an hour was satisfied." The three lived together for a while, until the wife went out to service as a nurse. After remaining at such service for a short time, she left it, and insisted that her husband should live with her. It was then agreed between the three, that the husband and wife should live together, and Margaritta should leave him, and receive ten dollars a month of his earnings, which were two dollars a day. Ere long, the wife insisted that she should live apart from the prisoner, and

receive the ten dollars a month, and this was agreed to. The money not being paid to her regularly, she insisted that her husband should live with her, which he did. It was while thus living with her, that she was taken ill, and after lingering some twelve days, died in violent convulsions.

The symptoms of her sickness, were all such as arsenic would produce. The scrapings of the floor on which she had vomited, were examined, and showed the presence of arsenic; portions of her body were examined, and enough arsenic was found to produce death. To allay her burning thirst, her husband had fed her with sugar and water, and the remains of the sugar, in the paper from which he had taken it, were found to contain arsenic, and during her illness, he had shown great reluctance to call in a physician.

He had told Margaritta that his wife had jewelry and articles worth $100, and during her illness he made two attempts to obtain those things from the place where the wife had left them for safe-keeping, and after her death he took her rings from her fingers.

During the progress of the trial evidence of the wife's declarations during her illness was offered and objected to. But on its being testified that she had said that she did not expect to recover, the evidence was admitted, and her declaration was that she believed she had been poisoned in some soup which one of the neighbors had made for her, but she had said that she did not understand why her husband gave her white sugar and water, and himself drank brown sugar and water, or why he drank sugar and water at all, for he had never done it before.

It was also proved that he had two parcels of white sugar from which he fed his wife — one in lumps, which did not contain arsenic, and the other was fine, which did contain it.

It was also proved that during her illness he worked only one day, but devoted his time to attending on her, and that he several times complained of being sick, and said that he had vomited, but no one had seen him do so.

The portions of the body in which the presence of arsenic

had been detected, had been taken from a corpse after it had been interred, and had been disinterred for the purpose. In summing up to the jury the counsel for the prisoner made it a point that the corpse thus disinterred had not been identified as that of the prisoner's wife.

*The District Attorney* insisted that he had omitted the evidence by inadvertence, and claimed the privilege then of supplying the defect. This was objected to by the prisoner's counsel, but admitted by the court, and evidence of the identity was given.

*The Judge* then charged the jury, and commenced by saying that the end of the year approached, and, to him, it was an event which would be right welcome. During the past year crime had flowed in upon them in an unusual current, no less than eighteen persons having been arraigned before him for the crime of murder. Of that number only one was native born; and, he said, these circumstances taught an important lesson, which it would be well for the jury to consider. We have opened our land to the persecuted of all nations, and in great crowds they have flocked to our shores. We have taken no pains to ascertain the characters of those who thus are allowed to seek a refuge among us. The high and the low, the good and the bad, are alike free to come, and we are not to be surprised to find among them many of the misdirected minds of the old world. Nor must we overlook the cause of that misdirection, when we are called on to sit in judgment upon its effects. That cause will be found in the circumstances which surround them from infancy to manhood. No adult comes to our shores without his character being modified or affected by them. These circumstances too frequently spring from those evil governments which crush the human mind beneath their iron tread, and unfit it for the sudden rebound caused by the enjoyment of such mental freedom as is accorded to all among us. They spring, also, from the want or the defect of education — very many coming among

The People v. Otto Grunzig.

us without that moral sense, that capacity to distinguish between right and wrong, which so eminently characterizes our people. They spring also from a feeling of hostility to all government, which grows with them to manhood, and which here arrays them in feeling against the law and its ministers; a feeling inconsistent with all our habits, and at war with all our institutions. And these together unite in creating in them a disposition to commit crimes unknown among, and almost incomprehensible to, us. Hence, in all such cases as this, where we are searching for motives, and are aiming to ascertain whether a homicide has been intentionally committed, we must not overlook this misdirection, but beware how we too rigidly adhere to a standard to which the moral condition of the accused may not be equal. But while we are thus warned to be careful to give to this misdirection its due weight, we are also admonished of our duty to protect the peaceable and law-abiding portions of the community against the aggressions of such misdirected minds, and of our duty to teach them what the freedom is which they may enjoy here, namely, that it is the freedom to pursue their own happiness, in their own way, provided, however, that they do not encroach upon or injure others. The judge said he had made these remarks in order to put the jury on their guard against being swayed from the proper balance of their judgment by the lamentable frequency of homicide cases among us, and to aid them in giving proper weight to a consideration to which it could not be expected that they could entirely close their eyes. The crime of murder was then defined by the judge. He did not at all propose to go into the testimony. His duty would be discharged when he presented to them, generally, the features of the case.

After explaining what the crime of murder was, he said the case presented to the jury three questions: Was the death caused by poison? Was that poison administered by the prisoner? Was it so done intentionally on his part?

As to the first question, they would consider the previous good health of the deceased, the symptoms of her sickness,

the appearance of the body after death, and the presence of arsenic in the body, in the vomit, and in the sugar; but in considering them the jury must inquire if all these circumstances were consistent with the theory of death by poisoning, for if any one of them was inconsistent with that theory they would not be warranted in finding that poison was the cause of the death. For that purpose it would not be enough to say that some of the symptoms and appearances were consistent with some other disease. They must be affirmatively inconsistent, or, in other words, they must be such as would not be there if poison was the cause.

As to the second question, was the poison administered by him? They must bear in mind that he had the opportunity to do it, and that he did administer to her sugar from the paper in which arsenic was found.

And then, as to the third question, the inquiry would be as to his motive for perpetrating the offense? Was it to get rid of a wife who was troublesome to him, or was it to get possession of her property, or both operating in his mind?

There was another consideration for the jury, that of the prisoner having been sick himself. He, the judge, did not recollect that any of the witnesses had said that they saw him vomit; but several of them testified that he said he was sick. If any of them saw him sick, it would be a natural and legitimate inference that he had partaken of the same sugar; and if that were so, the inference would be almost irresistible to a well regulated mind, that he did not intentionally poison her, because he hazarded his own life as well as hers. But another important view of this case is, that all this idea of sickness on the part of the prisoner, may have been fabricated by him to meet the result. The question is, was his sickness genuine, or was it fabricated on his part. For what did he fabricate the sickness except to meet such a charge as this? If it was real and genuine then they might well doubt whether there was any real design on his part to take the life of his wife. If they had any doubt that the death of the deceased was caused by poison, then they ought not convict the prisoner; or if

The People v. Otto Grunzig.

they believed that he did administer the poison, without knowing it to be such, they should acquit him.

The prisoner was found guilty of murder.